JUSTICE TRIEWEILER
dissenting.
I dissent from the majority opinion. The employer’s conduct in this case was not only unreasonable, it was arrogant and oppressive. Further review of the facts is necessary in order to fully appreciate what little basis LP had for its denial of Marcott’s claim.
Bruce Marcott was injured during the course of his employment on February 17, 1994, while working to repair a forklift with Gene Quillen. His injury occurred after he jumped down from the forklift, took two or three brisk steps to the rear of the forklift, and turned sharply to his left to walk around behind the forklift. At the point where he began his turn, he placed his weight on his left foot, and as *215 he pushed off he heard a loud pop that sounded like a gun going off, experienced an extreme pain in his left calf, and nearly fell to the floor. He was able to catch himself, struggled over to another part of the room, and sat down on a chair. In this condition, when questioned by his employer’s personnel, he explained that he was walking, felt a pop in his leg, and his leg went out.
Following his injury, Marcott was taken to a Belgrade clinic where he was examined by Dr. Robert Jackson. Dr. Jackson diagnosed an injury to a calf muscle, treated him conservatively, gave him crutches, and told him to return if his condition did not improve. Following that treatment, Dr. Jackson completed an Attending Physician’s First Report and Initial Treatment Bill, which was received by the insurer on February 23. On that form, he was asked whether the condition for which he treated Marcott was due to a work-related accident. He answered “yes.”
When Marcott’s condition did not improve, but instead worsened considerably, he was seen on February 21 by Dr. John Campbell, an orthopedic surgeon. Dr. Campbell admitted him to the hospital the same day, where he treated him surgically for a ruptured gastrocnemius muscle. On February 25, 1994, Dr. Campbell also completed an Attending Physician’s First Report and Initial Treatment Bill. In response to the same question regarding the cause of Marcott’s injury, he also answered that it was caused by a work-related accident.
Subsequent to Marcott’s release from the hospital following Dr. Campbell’s surgery, he developed blood clots in his leg and lungs for which he was readmitted to the hospital for further treatment. During that hospitalization, he was treated by Dr. David B. King, a family physician. During the course of that treatment, Dr. King specifically questioned Marcott about the activity he was engaged in at the time of his injury, and received a more specific description of that activity than had been given in response to more general questions which had been asked previously. In a later report regarding that conversation, he related the history given by Marcott, and his conclusions based on that history, as follows:
Mr. Marcott has indeed given me the history of the event occurring while making a sharp turn at a brisk walking pace. ... [I]t was during the hospitalization and in the context of reviewing the events of his original injury with an eye towards trying to better understand the sequence of events which followed. I consider it to have been spontaneous, uncoached, and valid testimony.
*216 To summarize, Bruce suffered what in my experience is a most unusual injury from a relatively benign activity which has led through a series of complications leaving him with the long term problem which I have just described. There is no reason to suspect that there is anything other than a cause and effect sequence at work, initiated by the brisk walking with a sharp turn to the left causing a minor muscle injury which unfortunately led to the compartment syndrome and swelling ultimately leading to the surgery and finally to the blood clot. There is likewise no reason to doubt that this happened at the time and place Bruce suggests. It occurred at work. While it is not specifically caused by any unusual demands placed on him by his employment (we all walk briskly and turn suddenly) it in fact happened at work and led to the above complications as described.
During the course of prolonged treatment for various complications from his original injury, Marcott was seen by five other physicians. All of these physicians submitted bills to the insurer which indicated that Marcott’s injury was work related. Altogether, eight physicians examined Marcott and billed the insurer for their services. Not one of them ever suggested that his injury was anything but work related.
In spite of all of this information, at no time from the date of Marcott’s injury until the date of trial did either Bill Fleming or John Mikkelson, the defendant’s employees who were responsible for denying Marcott’s claim, ever contact one of Marcott’s physicians to determine why, in their opinion, his injury was work related, or what specific description of activity they were relying on, or whether the doctors had information about his activity other than the general information gathered by witnesses at the scene of the accident when Marcott was more concerned about getting to the hospital than engaging in semantic distinctions about the specific type of activity he was engaged in when he was injured. Never did Fleming or Mikkelson question any doctor who had actually seen or treated Marcott about how this injury could have occurred while walking, or whether something other than normal activity would have been required to cause such an injury.
Instead, on March 21, 1994, Mikkelson simply wrote to Marcott and told him that his injury was not related to employment activities. *217 Subsequent to that date, Dr. Campbell made the following entry in his office notes:
I think all these problems are related to his initial gastrocnemius rupture which I documented at surgery which happened at work. I feel this is a work related injury, and all these complications are secondary to this work related injury.
That office note was received by Marcott’s employer on approximately April 7, 1994.
On April 29,1994, counsel for Marcott sent a letter to the employer which explained the nature of activity in which Marcott had been engaged at the time of his injury. Along with the letter he sent a notarized statement from the only person working with Marcott who confirmed that Marcott had been walking rapidly and turning sharply. In spite of all of the undisputed medical records and this additional documentation, LP continued to deny Marcott’s claim.
Instead of paying one cent to Marcott with which he could pay for his groceries, make his house and car payments, pay his medical bills, and support his family, LP waited until it concluded that it would have to defend against a petition in the Workers’ Compensation Court and spent its money hiring an expert consultant to review Marcott’s records. Even then it did not bother asking the expert consultant to personally examine Marcott or take a history from him. It did, however, pay that consultant $725 to review the records and issue a report, and another $2500 to appear briefly and testify at the time of Marcott’s trial.
In Stevens v. State Compensation Mutual Insurance Fund (1994), 268 Mont. 460, 886 P.2d 962, we cited authority for the following obligation on the part of any insurer or employer:
Our case law provides that “an insurer has a duty to make at least a minimal investigation of a claim’s validity in light of the relevant statutes. Absent such investigation, denial of a claim for benefits is unreasonable.”Lovell [v. State Comp. Mut. Ins. Fund (1993), 260 Mont. 279, 288], 860 P.2d [95] at 101. See also; Gaumer v. Montana Dept. of Highways (1990), 243 Mont. 414, 421, 795 P.2d 77, 81.
Stevens, 268 Mont, at 466-67, 886 P.2d at 966.
In this case, if the employer was not going to simply grant Marcott’s claim for workers’ compensation benefits based on the uncontroverted medical documentation that had been provided, then it had a clear obligation to further investigate by questioning at least one of his health care providers before denying the claim. Although the conclusion is so obvious it should not require authority, we have *218 clearly so held in the past. In Holton v. F.H. Stoltze Land and Lumber Co. (1981), 195 Mont. 263, 637 P.2d 10, we made the following statement about the triggering event for a finding that an insurer has acted unreasonably:
The triggering event for the purpose of awarding penalties for unreasonable delay or refusal to pay compensation is the insurer’s receipt of medical verification of a compensable injury. Unless such verification contradicts other evidence sufficient to make the verification inherently incredible, the insurer’s duty to pay commences and failure to pay (or deny a claim) will expose the carrier to the possibility of penalties after thirty days.
Holton, 195 Mont, at 268, 637 P.2d at 13.
In spite of the obvious obligation to investigate, and LP’s obvious failure to do so in any meaningful way, LP was allowed to justify its conduct based on its adjuster’s opinion that some doctors believe any accident occurring at work is automatically work related. Although there was no foundation for such testimony, even if it had been true it would have been totally irrelevant to this case since not one doctor who had seen the claimant and expressed the opinion that his injury was work related was asked by that same adjuster what the basis for his or her opinion was. If that testimony was not irrelevant enough, the Workers’ Compensation Judge made a total farce of matters by going on to conclude that “[biased on its own review of many, many medical depositions, the Court can validate the adjuster’s observation.” The trial judge’s finding gives new and dangerous meaning to the notion of “judicial notice.”
In summary, based on all of the evidence in this case, LP’s conduct was unreasonable for two reasons. First, if the real issue was whether Marcott was simply walking or was walking briskly and turning sharply at the time of his injury, then the employer conducted absolutely no investigation from which it could make that determination. It simply took great satisfaction in and then relied on an inadequate description of events based on an inadequate interrogation of the claimant at the scene of the accident while he was experiencing excruciating pain and concerned about nothing other than getting to the hospital or to a doctor.
Second, whether claimant was merely walking or was walking briskly and turning sharply makes absolutely no difference to the question of whether his injury was caused by a work-related accident. Section 39-71-119(2), MCA, defines an accident as an “unusual strain.” We have repeatedly held that when used in the Workers’ *219 Compensation Act, “unusual strain” refers to either cause or effect. Even assuming that LP’s arbitrary and unqualified medical opinions, which they arrived at without the benefit of medical consultation, were correct, Marcott’s ruptured gastrocnemius muscle would have been an unusual result from walking, whether the walking was normal or brisk.
The cases relied upon by LP to justify its denial of Marcott’s claim are simply not on point. In neither Ness v. Diamond Asphalt Co. (1964), 143 Mont. 560, 393 P.2d 43, nor Dumont v. Wickens Brothers Construction Co. (1979), 183 Mont. 190, 598 P.2d 1099, was there any evidence that the employees’ heart attacks were caused by work-related activity. In this case, there was no question about the fact that Marcott’s injury was caused by a work-related activity (walking). Marcott was attempting to fix his employer’s forklift. In an effort to do that, he hopped off the forklift, walked to the back of the forklift, and was attempting to go behind it. The only reason for this activity was to serve his employer. Therefore, his activity was clearly “work related.” The only dispute was whether at the time of his injury he was walking normally or briskly. However, as pointed out by the majority, pursuant to our decision in Robins v. Ogle (1971), 157 Mont. 328, 485 P.2d 692, that distinction is irrelevant.
Ness was decided before the language “unusual strain” was even included in the definition of injury or accident. In Dumont, the employee died in bed and the only contention by his survivor was that the activity which caused his death constituted an “unusual strain.” There was simply no contention that the effect of his activity was an “unusual strain.” Dumont, 183 Mont. at 192, 598 P.2d at 1101. Furthermore, there was no witness to testify that he even complained of an unusual problem in reaction to the activities he had engaged in. Finally, in Wise v. Perkins (1983), 202 Mont. 157, 656 P.2d 816, the issue again was concerned with whether the cause of that claimant’s injury was an “unusual strain,” not whether she could receive compensation had the effect of her activity been an unusual strain.
In Robins, we held that an unusual result from normal activity qualifies as an “unusual strain.” Robins, 157 Mont. at 333, 485 P.2d at 695. In Holton, we held that when an insurer or employer denies or unreasonably delays payment of benefits which are justified by uncontroverted medical documentation, it has acted unreasonably. Holton, 195 Mont. at 268, 637 P.2d at 13. In Stevens, we held that, absent a reasonable investigation, denial of a claim for benefits is unreasonable. Stevens, 268 Mont. at 467,886 P.2d at 966. In this case, *220 LP ignored all three cases and avoided any consequence. The entire burden of its unreasonable conduct must now be born by the unemployed claimant.
The majority’s disregard for the evidence in this case causes an extreme injustice and hardship for Marcott. He has not only lost a $40,000 per year job due to a work-related injury with no prospects for reemployment in the near future and been forced to live on and provide for his family with disability benefits that represent a fraction of his former income, he is somehow supposed to figure out how to pay thousands of dollars for attorney fees for services that never should have been required to recover disability benefits to which he was so clearly entitled. The reluctance of the Workers’ Compensation Court and this Court to pass the cost of unnecessary litigation to the responsible insurer is especially disturbing because it comes at a time when the laws have been changed to prevent injured workers from hiring the attorneys who have, in the past, been essential to the enforcement of their rights. See § 39-71-611 and -612, MCA (1987).
For these reasons I dissent from the majority opinion.
JUSTICE HUNT joins in the foregoing dissenting opinion.